Good morning, Your Honors. May it please the Court, Deputy Attorney General Katherine Israel, on behalf of Appellant California Attorney General Jerry Brown and California Insurance Commissioner Steve Poizner. The State would like to request reserve five minutes for rebuttal. You may do that. As I said earlier, the time continues, though, so you'll have to keep watch for yourself. Thank you, Your Honor. In 2000, the California legislature embarked on what would become a three-year effort to give California consumers greater control over what happened to the highly personal information they shared with their financial institutions. The author of this legislation expressed her intent that, quote, consumers should be the final arbiters of what happens to their personal financial information. The law that was finally passed in 2003, California's Financial Information Privacy Act, commonly known as Senate Bill 1 or SB 1, was intended to give consumers the right to stop financial institutions from disclosing their personal information to third parties or affiliates. Among other things, before a financial institution can sell or disclose information to an affiliate, SB 1 required the entities to give consumers notice and the right to stop this disclosure. Before this affiliatarian provision was ever enforced or even operative, appellees and associations mounted a facial challenge to the provision. In 2005, the Ninth Circuit held that this affiliatarian provision was preempted at least in part by the Federal Fair Credit Reporting Act or the FCRA. The Ninth Circuit, however, did not invalidate the entirety of this provision. Instead, it held that the only information that was preempted under the FCRA was information of the kind contained in the definition of consumer report set forth in 1681d1 of the FCRA. That is, in order for information to be preempted and therefore not subject to regulation by SB 1, the information first had to bear on one of seven factors, creditworthiness, credit capacity, credit standing, mode of character, reputation, personal characteristics and character, what the district court referred to as the scope prong. Even if information met the scope prong, it was only deemed preempted under this Court's definition if the information was collected, used, or expected to be used in whole or in part for purposes of determining eligibility for credit, insurance, employment, or other discrete purposes. With this limited information, limited definition in mind, the Court sent this case back to the district court with two questions. Applying this definition of what is information, the court asked the district court to determine whether any portion of SB 1 survived preemption, and if so, whether that portion could be severed from the remainder of the statute. The State has already set forth in its briefs the reasons why, on remand, the district court erred in finding that the statute was what was wholly invalid. Without hearing any facts into evidence, the district court held that the entirety of this affiliatory provision was preempted. Unless the court has found that. Roberts, are you arguing now, are you arguing today that there are no portions of the statute that are preempted? No, Your Honor. What we are arguing is that what the district court should have done is it should have applied California law and determined whether the statute could be reformed, could be construed. So the real question, the real question here is not whether a portion of the statute is preempted, because we know now that that's a fact. Certainly. Based on the prior panel's opinion, you don't? Oh, not at all, Your Honor. No. So now we are left with the question of whether the statute was severable. That's the real issue here, isn't it? The real issue, yes. The real issue is whether the statute is severable applying the applying California law. And California law requires that a court can and should sever by construction, sever by application, sever by meaning, as the California Supreme Court said in Cobb, it can and should construe a State statute in a way to preserve its constitutionality. And the district court, of course, said that it wasn't severable. Correct. Let me ask you a question about the appropriate remedy if we agree with your argument that the district court's conclusion is incorrect. Do we just send it back again and say, try again, because that was the court never got to the question that was actually asked originally, in a sense, as it sort of skipped over the first part and went directly to the second? The remedy is not necessarily the court's attempt to get back. The court need merely say that there is information that SB1 regulates that is not preemptive, and therefore, SB1's affiliatory provision, when I refer to SB1, I mean the affiliatory provision just for shorthand, that that provision can be interpreted to apply only to information that is not preemptive under the definition. Now, what that definition, what that information is, is significant. And there are three points the State would like to address today. First, the State would like to give examples of the types of information that are not preemptive under the Ninth Circuit's definition. Second, the State would like to address the appellate's, the appellee, the association's and the court's belief that it would be too speculative to require financial institutions to determine in advance what information met the purpose prong of this definition, to determine what information it had to have it was preemptive and what information was subject to SB1. And finally, and this is the point I think Your Honors are focusing on right now, and I can turn to that first if you would like, the State would like to address the association's argument that the district court was required only to mechanically and literally look at the statute and see, is there a portion that meets the Ninth Circuit's definition of what is preemptive information such that that can be physically excised from the statute, if you will. If the Court would like, I can address that first, or I can go through and give briefly the examples of the numerous types of information that is not subject to regulation. Sotomayor, you can go through in any order that seems appropriate until we interrupt with questions. Thank you, Your Honors. With respect to the first point, the district court believed that there were numerous types that the district court believed that virtually all information a financial institution has in its possession is preemptive under the definition provided by the Ninth Circuit. That is not so. I can give two examples. The only information that is preemptive under the Ninth Circuit's definition is information that meets the scope and the purpose prong of the definition. This would exclude, for example, any type of information a consumer gives to a financial institution when applying for a noncredit or noninsurance product or service. I may walk into a bank tomorrow. I want to open up a safety deposit box. In the course of filling out my application, I give the bank my name, my home address, my home telephone number, my Social Security number, my driver's license, my husband's name, address, driver's license, Social Security number, perhaps date of birth, perhaps even e-mail address. That information is not being provided to the bank, and the bank is not collecting it for a purpose that fits within the SCRA. And yet, unless under the district court's invalidation of SB 1's affiliation provision, that information can now be freely shared with affiliates without consumers' notice and the ability to stop that disclosure. That was just one of the types of information the California legislature had in mind when it said that it should be consumers who are the final arbiters of their private information. And the Ninth Circuit has said as long as that information is not used for a credit purpose or an insurance or employment-related purpose, we are free to regulate that. A second example of the type of information that continues to be validly regulated under SB 1's affiliate sharing provision is information contained in my credit card statements, not information to monitor my payment history or information that the financial institutions may contend is used for a credit purpose, but simply what I buy and where I buy it, what magazines and newspapers I subscribe to, whether or what kind of alcohol a person likes, whether a person buys pornography. All that information is contained in credit card statements, and that information is certainly far afield from the type of information that the Ninth Circuit had in mind when it said information that was preempted is limited to information for a credit reporting purpose. And yet, absent SB 1, that information can then be shared, sold to affiliates who may not even be financial institutions without the consumer even knowing that that information was being sold. And again, that was precisely the policy judgment of the California legislature. And I would just ask to refer the Court to the findings 4051 and 4051.5, as well as various statements in the legislative history that indicate that they were most concerned with giving consumers as much privacy as possible, privacy protection as possible over consumer's personal financial information. Turning to the second point, the associations have contended that it would impose too much of a burden to require them to determine in advance what information is protected, meets an FCRA purpose and that which is not, for purposes of determining whether it needs to give notice to affiliates. And what the associations have essentially said in their arguments is, since 1996, Congress has said we do not need to analyze the information that we share with affiliates, because Congress accepted from the definition of consumer report information shared with affiliates. That statement is overly broad. What Congress did in 1996 was it did carve out sharing of information with affiliates, but it did not wholly exempt it from regulation. For example, 1681A, I can think of two examples where financial institutions, even though they are sharing information with affiliates, still need to analyze, does this meet the purpose of the FCRA? One is information that is, that consists of application information. That falls within the definition of what's called other information under 1681A, AD 1 to 2 of the FCRA. Information that would otherwise be a consumer report, but which is not the experience information of a bank. In other words, it is not information that a financial institution gets from its dealings with a bank. For example, when I apply for a credit card. Or information a bank may get from other banks' experiences. That information may be shared with affiliates, but first, I'm sorry, that information may be shared with affiliates, but first the institution must give notice and the ability to opt out. A second type of information that a finance, a second type of information that financial institutions must analyze before sharing with affiliates is information that it intends to sell or share with an affiliate for marketing purposes. Information that would otherwise meet the exception for experience information can be shared with affiliates, but first, the financial institution has to give the consumer notice and the right to opt out of that solicitation. I give these two examples to demonstrate that it is simply inaccurate to say that financial institutions do not have the burden of reviewing information that they share with their affiliates right now, because they do. They determine as a threshold matter. Does the information meet purpose and scope? If they do, then it is off limits from regulation. But even for, under SB 1, but even for purposes of the FCRA, they still need to analyze other information to see and give opt out under the FCRA in order to decide whether or not, in order, before they can share it with the affiliates. Turning to the third point that the State would like to address this morning, the association's argument is that the district court was required to limit its analysis of SB 1's affiliate sharing provision, to literally review the statute and see, is a portion of it, can it be excised from, can it be severed from the rest of the provision? The associations in essence argue that the district court should not have applied a reformation analysis, but really should have just literally looked at the statute to see whether or not it was physically capable of severance. Doing so, that argument fails for at least two reasons. First, it would indeed violate the principles of Federalism to require the district court to ignore California law. The United States Supreme Court in IOTI confirmed that a Federal court can and should construe a State law to preserve its constitutional applications. Applying California law, the test to apply is the test that was set forth in Copp v. FPC, namely, would the reformation closely effectuate the policy judgments of the legislature, and secondly, would the legislature have preferred a reform statute to no statute at all? The Copp court underwent an exhaustive analysis of the types of numerous cases in which courts have reformed State statutes, and in fact said that cases like Metro Media, which stand for the proposition that a court cannot rewrite a statute, are simply overbroad dicta. And it set forth the following standard. The question for Federal courts is they must stand in the shoes of the California Supreme Court and ask themselves, what would the State court of highest resort do? And in this instance, the numerous California decisions that we cited in our briefs, as well as the more recent California Supreme Court decision in Sandoval, confirmed that reformation is appropriate and indeed required when it would closely effectuate the policy judgments of the legislature. Here, the policy judgments are indeed clear. The legislature wanted to protect consumers' privacy. If you had to write an opinion for this Court, what would be the paragraph that describes the reformation that you think is required and permissible under California law? The paragraph would be similar to those cases in which courts have not had. No, no. About this statute. Sure. It would be more of a limiting one. I was going to make the analogy to cases in which they've limited First Amendment cases, like the definition of information is limited to information that does not fall within the definition of the type of information contained in a consumer report. And that would simply, with respect to affiliate sharing. And it's clear the Ninth Circuit, and this is, this actually is in keeping with the second IOD principle, which is whether or not you can reform a statute depends upon how clearly articulated are the constitutional boundaries. Here, the Ninth Circuit in its previous decision clearly said, here's what's preemptive, information that meets purpose and scope. Here's what's not. So all this Court needs to do is to fashion the remedy to say, the affiliate sharing provision of SB 1 applies only to information that is not, that does not fall within the definition of consumer report. Why do you think the Court didn't do that the last time? I mean, it sounds like I'm complaining that it's back to us, but what, why didn't the Court do that in its, this Court do that in its first decision? And I think that's one of the, one of the difficulties of this case is that, when the Court sent the case back, it asked the district court to apply this definition of information to see whether or not, are there, basically to apply California law. And under California law, COP clearly states that they can do this. And this is one of the issues, the problems, I believe, with the district court's conclusion is there was no evidence, and if the district court were to completely invalidate a provision that applies to constitutional, constitutional information, it should not have done so in the facial validation. There were no facts in the record whatsoever to support their belief that it would be too speculative for a financial institution to determine what the line was between what's preempted and what's not preempted. And I'd like to reserve the rest of my time. You may do that, unless you have further questions. Thank you.  We'll hear from Mr. Bruce. May it please the Court, I'm Edward Bruce, and I'm speaking for the associations. You're going to have to keep your voice up. That microphone works very poorly. Let me say again. We have very poor acoustics, and we'd love to hear all of your arguments. All right. My adversary has made a very strong argument for some points here, but they're not the ones that are at issue. She's presented this case to you as though it turns upon whether or not there are parts of SB 1 that could be applied separately outside the preemption that the Court has considered. That's not the issue. The issue was framed very clearly by the mandate, and that was whether any portion of SB 1 survives preemption. And understandably, therefore, in our brief to you and in our brief to Judge England, that's the way we argue the case, because they have never, ever been able to point to any portion, any part of the statute that itself avoids preemption. And the reason for that is that every word of SB 1's affiliate sharing clause applies not just to the protected information that's called a consumer report, but also to the other kinds of information. So the task was one, well, how do we divide this up? And California law, well, first of all, you have what the court of appeals told them to do, and they have never done. Well, we get to decide what the mandate means, I guess. And it seems to me a rather hyper-technical reading of it to require that it be a numerically separate section. For example, if there were a statute that said the following law defining something applies to private entities, municipalities, and the State, and we said, well, it can't apply to municipalities, presumably that could be severed, even though it's all within one sentence. So ---- Let me answer the question, the comment, this way. It might be helpful if you have our briefs at hand, you perhaps don't, to look at page 13 of our red brief, because I want to read from a statute. And the statute is SB 1 itself. It's the severability clause. And it says this. If any phrase, clause, sentence, or provision is declared to be invalid or is preempted by Federal law, I want to emphasize that, or is preempted by Federal law or regulation, the validity of the remainder of SB 1 shall not be affected thereby. That is what this Court's mandate really said in slightly different terms. But the point is this. SB 1 was a very controversial bill. The interests that I represent were very concerned about it for a lot of reasons. It was, in the words of the State itself, as presented down to Judge England in the district court, it was carefully negotiated over three years. And this is the clause that, to me, clearly requires ruling for us in this case, because the legislature wasn't saying we'll accept anything the courts might come up with in their construction. They were very clear that it had to be a different part, a remainder. And as I say, they have never been able to do that. The reason I wanted to emphasize the words Federal law or regulation, that shows that this whole thing was negotiated, decided by the legislature in the framework of a probable, and indeed it happened, suit such as we brought. So this is carefully designed for that purpose. And to sort of throw that out the window and say, well, we're not going to pay attention to the plain language of what the legislature did is to ignore legislative intent. That's the clearest thing. Sotomayor, if you were looking at the COP construct, you'd almost be in the last part of it. That is, you can reform a statute to make it constitutional if that would affect the legislative intent. And you're saying it doesn't affect legislative intent in this instance because the language. This severability clause was carefully written. The legislature knew that they could have sanctioned the kind of thing that the State is asking you to do because they often did that. There are three cases that they rely upon. One is COP. There are let me look at this just a second. COP is one of them. The Brockett case, which is in the Supreme Court of the United States. The, I'll call it the New Hampshire case because I'm not sure how to pronounce that name, the one written by Justice O'Connor. In all of those cases, the legislature had done the kind of thing that the State wants to do here. The legislature had provided in those cases for severing applications, severing applications of a statute. Well, if the legislature had said nothing specific in this statute at all, had just said here are 14 things we want to accomplish and here we are busy accomplishing them, then presumably the fallback would be the COP principles, which are we can reform it if necessary to effectuate legislative intent and so forth. But I take your argument to be that if the legislature has expressed its will about severability, that has to be factored in. To me, it should be the dominant factor. And let's talk more about COP and CATS and the other cases they rely upon. In those cases, COP, the challenge word was fiscal year. That's a phrase that you can put some interpretation on. In the CATS case, it was wrongful act. In the ---- Well, here it's information. I mean, I don't know if it helps to just say there's a word or phrase because ---- Well, but construing information, information has already been construed once. That's what happened in Round 1. We did make in Round 1 a broad facial attack on the statute. We argued, consistent with the plain language of the Federal statute, that information meant any kind of information. Court of Appeals disagreed with us. Judge Fletcher wrote for the panel that, no, this is a special type of information. It's only the information contained in the credit report. That's already been construed. They want to further narrow that in a different way to somehow change the meaning of the information as it's used in SB 1. What they don't tell you, and I'm sure it was an oversight on counsel's part, is that the definition of this nonpublic personal information is not only used in the affiliate sharing clause. It's also used in the clause that prohibits sharing amongst third parties. And that stays as it is. We never made an argument as to that. So the word information would have to have two different meanings under their approach. One would be the one that incorporates the Federal law that was applied. The other would be in one that doesn't have that incorporation. I've never heard of such a thing, of taking this general definition, and it's closely, you know, carefully defined in SB 1, and interpreting it one way in one context and another way in another context. Now why do you think that the first panel didn't simply resolve this piece of litigation? I can't tell you. I wish they had. I enjoy arguing in this court as I have before. But I think there was uncertainty amongst the panels how they wanted to do it, but they were very clear. Couldn't have been clearer what had to be shown, and the State has never shown it. Now, let's do talk a little bit about the New Hampshire case, because it too dealt with a New Hampshire statute that allowed severing of applications. So that was fine. But Justice O'Connor was clear in her opinion that at the end of the day, this all had to be consistent with legislative intent. And in fact, the case was remanded back to the First Circuit to determine whether the legislature would ever have sanctioned this kind of thing. There was never a decision on that. The case was settled, so I can't tell you how it would have come out. But I can tell you this, because it's the State's own words. It's at page 17 of their yellow brief. In order to have one of these constructs, your word, Judge Graver, you have to show that it closely affects policy judgments clearly articulated by the enacting body. That's the test. I think it's the test that's in Katz and Kopp as well. But here, that test is not even closely satisfied. Counsel says we know a lot about what the purposes of the statute were and that they were to protect individuals as much as possible. It seems to me that your best shot is on the second piece of that, which the test, which is the enacting body would have preferred such a reformed version over the invalid one. And I'm paraphrasing. I was going right to that point. And that seems to me where you can take a stand based on the language of the statute. On the plain language, exactly, Your Honor. That was — I'm not trying to flatter you. That was exactly the point I was going to make. It seems to me — I guess just to be candid, so you know where my thinking is, that seems to me the only argument that to me is persuasive, it seems to me that there's — that all the other pieces of the puzzle are here, that is, that the legislature has a certain intent that it's told us about. And it seems to me that there's no other piece of the puzzle that is protecting individual consent. Well, that's part of it. But it's by no means all of it. We did call your attention to a decision of a California court after this one, the registry case. There, the kind of evidence that was mustered to satisfy this difficult test was far different. They had legislative reports. They had all kinds of things to try to satisfy it. And the court of appeals, the California court of appeals in that case said, no, that's not enough under this test. Here, our case should be a fortiori because we have this carefully crafted severability test. For this one, this isn't some general broad severability for all things. It's crafted for this complex situation. Now, talking about complexity, let me refer to another part of Justice O'Connor's opinion, where she says, we federal courts should not get involved in complex line drawing. And then she characterized what that meant. There's a lot of complex line drawing that would be required in the construct that the state is asking you to order. I'm not saying that there — I've never said there isn't some possibility of complying with the statute. They've tried to make it look like that's our argument. It's impossible to comply with. We never argued that. We argued to Judge England what I'm arguing to you today. And we were right then, I think, and we were right now. Now, I'm trying to think whether there's more that I need to say that you're interested in hearing, but — just a second, please. Well, this is important. The Severability Clause is a faithful enactment of the general California test. The general California test requires the grammatically severable. It requires something that's the same thing as no portion. And it absolutely requires that the legislature would have preferred this to anything else, to what we're suggesting. There are all kinds of complications that do arise and that show that the legislature couldn't have preferred this. For example, there's a notice requirement that you have to give to every customer of your bank or whatever it is. And that says that we restrict information sharing with affiliates. Now, that was true, as SB 1 was enacted before it was changed, if you will, by the earlier panel's decision. It's something that every bank has to tell these consumers, even though now the most personal type of information like character, mode of living, reputation, that kind of information in a consumer report is not restricted. In other words, you don't have to simply try to put some gloss on the word information in SB 1 as it's used. You've also got to deal with problems like that notice requirement, because no bank could faithfully make that representation in the current circumstances. And you also have to ask yourself the question, if this kind of really important personal information isn't protected any longer, and it's clearly not if it's in a consumer report, then why in the world would the legislature have created this very difficult regulatory situation? Finally, I think this is, I hope, a clinching point. Like California frequently does, in this case, they enacted enormous penalties for violation. For example, if you send two pieces of information to different consumers negligently, you didn't mean to do it, you're trying to comply with the statute, but you're negligent, if you do that, you're subject to a fine of $500,000. $500,000. Think of how all that could accumulate as you go through this process. As I say, it's not an impossible process, but it's a difficult process of drawing the distinctions between information that's protected under the FCRA and information that isn't. She mentioned credit headers. That's in their brief, too. Names and addresses and things like that. Look at page 17 of their brief. In the text of page 17, credit headers can never be part of a consumer report, and therefore they're not protected. But then you read the footnote, and the footnote says, well, on the same page, if you group these together, if you bundle these credit headers, then it can be. And on a later page, page note 27 of their brief, they say correctly that whether something is or is not in a consumer report is something that depends on the intent at the time of collection. Now, can you imagine the kind of litigation fueled by these enormous penalties that the state can assert that gets into what was the state of mind and intent when this was done at that time? Again, not impossible, but very difficult, and these enormous fines take this case out of, you know, there's nothing like it in any of the other cases where there's been this kind of statutory, quote, reformation. But, of course, they could pass such a statute if they chose to do so. The thing that bothers me about this case, and maybe you can clarify it. I know you have a couple of minutes left. This panel is alert to what they were doing. You have two former law professors and a chief judge who's not known for a loss of IQ, and they come up with this language, and this language must mean something. And it strikes me that if they wanted to take your position, they could have taken it at the end of that case. What did they have to send back? Why, if they agreed with your argument, why wouldn't they just have made their decision in your favor then? Well, here's what happened, Judge Wallace. They didn't really rule for us the way we wanted them to. We offered, and you read the statute, it's the language of the FCRI preemption clause, that all information, all information was constitutionally protected. They rejected that argument and crafted their own much narrower, well, not much narrower, but still narrower version of what was and wasn't protected. They did that. There was no argument before them like I'm having with you today about, well, how do we slice and dice this? That was something that had to be done in the aftermath of the way the court of appeals interpreted the word information. If your argument is correct as to what the panel sent us down to do and what the district court's result was, would you fault the injunction that was entered? We think the injunction as entered by Judge England is probably correct. We have a cross appeal here because we had some. We wanted to make it clear that, to this Court, that the injunction should have not used the word to the extent it is preempted, because that could be confusing. It could lead to future litigation. All we're asking you to do, though, today, in terms of relief, if you agree with our argument, is to simply decide it the way you're going to decide it. And you'll imagine, I'm sure, there will be an opinion. And then we ask you to remand it to the district court so that he can craft the injunction exactly in the guidance. Okay. I see what your position is. Your position is, if we agree with you completely, the injunction is wrong and it should be vacated and sent back for reconsideration. Having said that position, doesn't that indicate what the district judge's view actually was? I think the district court thought this, Your Honor. I genuinely do. What he thought was, look, I have said that you can't draw these separations. It's too hard to do that. And that means that the whole provision, the affiliate sharing provision in whole is preempted. I'm pretty sure that was his intention. It would be helpful for you all, when you make your decision, to remand it and give him another opportunity. And, of course, we would aid him in our suggestion. He wants to see this case again? Well, I don't know whether he does or not. He is a former professional football player. I think he thought he had scored a touchdown here. And I'm trying to figure out what he really meant, trying to put together the decision he made together with the injunction he entered. And I'm having some difficulty. Well, I can only speak from, you know, observing him in that proceeding. But I'm almost sure what he meant was, look, what I said is that the whole affiliate sharing clause is preempted. And that's what that phrase meant. And I just wanted to make sure. That's what I assumed your argument was. Yes, sir. And if that's true, then the injunction seems to be a little inconsistent. Well, but he can't, as I understand it, upon motion, interpret his injunction. Yeah. Thank you very much. Thank you. We have some rebuttal time remaining. Thank you, Your Honors. Very briefly, the State would like to respond to some of the arguments raised by the associations. Counsel, before you get to that, real quickly, I thought Judge Wallace's last question was extremely important. Can you address, if you will, for my benefit, if not for the other panel members, what your interpretation of the judge's caveat, so to speak, was with respect to the extent it's not preempted? It is our understanding that the district court invalidated the entire disprovision, which is why the district court erred as a member of the law. All right. But why — if that was the judge's intention, why wouldn't the judge just say this statute is, you know, invalid, it's preempted, period? Why say to the extent — why the tagline? I think that was Judge Wallace's question to previous counsel. I agree there is confusion with respect to his decision. In looking at his analysis, however, he disagreed with the contention that you could determine — you could determine — So you agree with opposing counsel. His position is that the judge, in effect, invalidated the statute and that the injunction is, therefore, as written, inconsistent with his ruling. I believe his ruling was that the entire — was to — was that the entire affiliatory provision was preempted. That's what I believe his ruling was, which means that he swept into the scope of his injunction constitutional information that was constitutionally permitted to be regulated under the Ninth Circuit's definition. Well, okay. I know that you disagree with opposing counsel in that regard. I'm just saying that your contention is that the judge, in the body of his ruling, invalidated the entire application of the statute. That is our — that is our reading. And that is what opposing counsel agrees with. Well, I — no, that's why I believe they filed the cross-appeal, because there was ambiguity, and he wanted to be certain. Am I right? Well, no, he — he — his contention is that the — that little tag phrase was ambiguous. You agree with that. Yes, but I agree that the remainder of his decision is clear that — All right. All right. I think we're on the same — on the same ballpark. Very quickly, with respect to the association's argument, the associations contend that there would be enormous penalties attached to what is basically speculative guessing on the part of a financial institution if they guess wrong with respect to what information is preemptive and that which is not. First, as we said earlier, financial institutions make that determination all the time with respect to information they receive. They have to analyze it to see if it meets the purpose requirement of the FCRA. Secondly, the penalties are overstated. First, there's no private right of action. Functional right of action. But, counsel, I know you have a lot to say about this point, but before your time runs out, I'd like you to respond to one of the arguments of opposing counsel, and that is specifically their argument that — excuse me — that the severance not occur except in certain circumstances that aren't met here. Could you respond to that specific argument? Certainly, Your Honor. What the associations are doing is essentially elevating a fairly standard severability clause over specific findings by the legislature. And in looking at the — looking at the statute as a whole and looking at the legislative history, I would point to pages 9 of the appendix in which the author said consumers were concerned about their financial privacy. But aren't those two different parts of the test? One part of the test seems to ask what are the legislature's interests in having the statute enforced? But then the last piece of the test is different, and it says new issue, would the Yes, Your Honor. That's exactly correct. And that's — that is the test to apply, is would the legislature have preferred a statute that gave only some protections to a statute that gave no protections to no statute at all. And there was evidence in the record, page 33 of the appendix, in which there was discussion. Because, remember, at that time, the legislature knew that any legislation passed before January 1, 2004 was preempted by 1681t of the FCRA. And there was also discussion, which is mentioned in the legislative history, that there was some talk that some federal agencies are going to challenge the statute as being preempted. And there is a quote in there, page 833, that supporters have expressed the intent that even if the statute is preempted as to some institutions, we still would rather have some protections versus no protections. And that going again to the — going back again to what is the intent of the legislature and would they have preferred the reform statute to no statute at all, it is clear that the legislature would have preferred that the statute, even if it did not apply to certain types of information, still be robust and apply to the different types of information which is not covered by the Act. A final point with respect to that issue, Your Honors, is there is no need for the existence of a severability clause at all. That was the opinion of Justice Mosk in Kopp v. FPPC. His was a concurrence, and the majority specifically said in Note 58, we reject Justice Mosk's view that you need to have specific language in the legislature saying we are going to allow you to sever a statute. Essentially, the answer is no. Sotomayor, this is a slightly different question than that. Given the backdrop of the California courts' decisions that say reformation to make something constitutional is allowed and severance is allowed, can the legislature nonetheless express its intention to limit severability, express its intention by saying we are going to allow severance only in certain situations and not others? Can they do that? And if they can, have they? I do not believe they have done so. And I would point to the California Supreme Court's case in Walnut Creek where a similar thing happened with the courts. Basically, the severance clause in that case applied to either employment and it was extended to apply to housing or vice versa. I can't recall which. And the Court said that that was just sloppy. Let's look at the totality of the statute. That was sloppy. That was sloppy drafting. That was a mere oversight. And similarly here, the very fact that there was a severance clause means that they So the fact that you don't need a severance clause at all is important. And the fact that in this instance, weighing the severability clause and what's fairly rote language, weighing that against all the other indications of what the legislature wanted, it is clear that the legislature in this case would have preferred to have a weakened statute, no statute at all. And that's the difference, by the way, with respect to U.D. Registry. In U.D. Registry, the Court said, no, there is no evidence that the legislature really would prefer to have, would require consumer reporting agencies to sift through information to see what applied and what doesn't apply. Here the standard is, would they prefer a revised statute to no statute at all? Thank you, counsel. I've used up a lot of your extra time with questions, but your time has expired. I think the case is submitted, and we appreciate the arguments of both counsels. It's been a very interesting argument. And with that, we will stand adjourned for this session. Thank you.
judges: Wallace, Graber, Timlin